Phillip SMITH, Sr.; Phillip Smith, Sr. Family; Mike Jackson; Harris County, Texas; and Texas Water Commission, Appellants,

v.

HOUSTON CHEMICAL SERVICES, INC., Appellee.

No. 3–92–482–CV.

Court of Appeals of Texas, Austin.

Jan. 19, 1994.

Rehearing Overruled March 30, 1994.

---

Robert M. Long, McElroy & Sullivan, L.L.P., Austin, for Phillip Smith, Sr. and Phillip Smith, Sr. Family.

Mike Jackson, State Representative, Dist. 29, LaPorte, David H. Melasky, Houston, for Harris County, TX.

Dan Morales, Atty. Gen., Nancy E. Olinger, Linda B. Secord, Asst. Attys. Gen., Austin, for TX Water Com'n.

Paul Seals, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Austin, for Houston Chemical Services.

Before POWERS, KIDD and B.A. SMITH, JJ.

POWERS, Justice.

 After a contested-case hearing, the Texas Water Commission issued to Houston Chemical Services, Inc., a permit to construct and operate a commercial hazardous and nonhazardous industrial solid-waste facility. The trial court, on judicial review, affirmed the agency order authorizing the permit. The dissatisfied parties appeal to this Court.[1] *See* Solid Waste Disposal Act, Tex. Health & Safety Code Ann. § 361.001–.510 (West 1992) ("Act");[2] Administrative Procedure Act, Act of May 4, 1993, 73d Leg., R.S., ch. 268, sec. 1, §§ 2001.001–.902, 1993 Tex.Sess.Law Serv. 587, 737–54 (to be codified as Administrative Procedure Act, Tex.Gov't Code Ann. §§ 2001.001–.902) (effective Sept. 1, 1993).[3] We will affirm the trial-court judgment.

## THE CONTROVERSY

Houston Chemical applied for a permit to build the facility in Harris County near the City of LaPorte. *See* Act § 361.003(3)-(4). Harris County, the City of LaPorte, Smith, the Honorable Mike Jackson, and others appeared in the contested case in opposition to the application. After hearing evidence and legal argument in the case, the examiner recommended in his proposal for decision that the application be denied. *See* APA § 2001.062. The Commission, however, approved the application, and in its final order directed issuance of the permit. Smith, Jackson, and Harris County sued the Commission in a Travis County district court as authorized by section 361.321 of the Act. Houston Chemical intervened to protect its interest acquired under the permit.

The trial court affirmed the Commission order after trial. This appeal ensued. Smith, Jackson, Harris County, and the Commission collectively bring numerous points of error. We will discuss these points

---

1. The appellants are Phillip Smith, Sr. and the "Phillip Smith Family," the Honorable Mike Jackson, Harris County, and the Texas Water Commission. Mr. Jackson is a member of the Texas Legislature. We shall hereafter refer only to Smith, Jackson, and the Commission, in addition to Houston Chemical. We overrule the motion of Houston Chemical to dismiss Jackson's appeal.

2. Authority to sue the Commission is given in section 361.321 of the Act. The statute declares that "[a] person affected by a ruling, order, decision, or other act of the ... commission may appeal [sic] the action by filing a petition in the district court of Travis County"; and "the issue is whether the action is invalid, arbitrary, or unreasonable." Act § 361.321(a), (c). This statute is about as poorly written as it could possibly

be. To render it understandable, and to protect against its possible violation of the separation-of-powers mandate of the Constitution of the State of Texas, we construe subsection (a) as authorizing suits for judicial review in a district court of Travis County in accordance with APA § 2001.-001–.902. We believe subsection (e) was intended to incorporate the entire scope of review allowed by APA §§ 2001.171–.174; we infer as much from the words "invalid" and "unreasonable." These words seem to us to imply the applicability of APA § 2001.174(2)(A)–(E) as well as § 2001.174(2)(F).

3. Effective September 1, 1993, the Administrative Procedure and Texas Register Act ("APTRA") was incorporated into the Government Code, without substantive changes, and renamed the Administrative Procedure Act.

separately or jointly as their contents suggest.

## THE COMMISSION'S APPEAL

■ After trial but before the district court rendered judgment, the Commission requested leave of court to amend its preceding answer by filing a third amended original answer. The new pleading would have conceded several material allegations pleaded against the validity of the agency's final order. The Commission prayed in the new pleading that the trial court, based on these concessions, render judgment denying Houston Chemical's application for the permit. The trial court denied leave to file the third amended original answer. *See* Tex.R.Civ.P. 63.

In a single point of error, the Commission contends the trial court abused its discretion. *See Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 634 (Tex.1986) (trial court decision whether to allow trial amendment may be overturned only upon showing abuse of discretion). Harris County makes the same contention in its points of error one and two; Smith and Jackson complain of the ruling in their point of error 458.

It is readily apparent that the trial court lacked authority to render judgment denying Houston Chemical's application—the sole relief the Commission requested in its proposed third amended original answer. The granting or denying of an application under the Act is an executive function committed exclusively to the Commission. The terms of APA § 2001.174 empower a reviewing court merely to *remand* a case to the agency if it reverses an agency order granting an application. *See Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699, 714 (1959); *Short v. W.T. Carter & Bro.*, 133 Tex. 202, 126 S.W.2d 953, *appeal dismissed*, 308 U.S. 513, 60 S.Ct. 140, 84 L.Ed. 438 (1939); *Daniel v. Tyrrell & Garth Inv. Co.*, 127 Tex. 213, 93 S.W.2d 372, 375–76 (1936).

In all events, the Commission's motion stated no grounds for the relief it requested; and the agency did not explain its failure to concede before trial the invalidity of its final order. The agency did not contend, for example, that it had acted without jurisdiction in rendering the order, and the agency does not make that contention now. Undoubtedly the Commission has a continuing duty to protect the public interest, but this duty also existed at the time the agency rendered its final order. The order is presumed to be valid in its adjudication of the public interest *and* Houston Chemical's *private* interest that arose under the permit. The Commission was obliged to assert *some* basis for its unusual action and it has not done so, either in the trial court or in this Court. It appears to be the Commission's position in both the trial court and this Court that the agency simply has an absolute right, as a matter of law, to obtain a reversal of its order, cancellation of the permit, and a recall of the case *for no reason at all,* merely by conceding the allegations attacking its order. We find no authority for that position and no legal error in the trial court's action. We therefore overrule the complaint that the trial court abused its discretion. *See generally Landon v. Jean–Paul Budinger, Inc.*, 724 S.W.2d 931 (Tex.App.—Austin 1987, no writ); W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals*, 24 St. Mary's L.J. 1045, 1050–53 (1993).

## HEAT–SURGE VENT

■ In their point of error "I.A.1," Smith and Jackson complain the Commission violated an agency rule dealing with permit applications; Harris County raises the same complaint in its point of error sixteen. They refer to the following:

Houston Chemical plans to affix a heat-surge vent to the top of a rotary kiln in which will occur the first burning of the waste materials. The vent is a safety device, designed to open on an emergency basis to relieve pressure in the rotary kiln should the pressure rise to a dangerous level. Secondly, both the Commission and the Texas Air Control Board (the latter was a party in the contested case, owing to the air-quality aspects of the proposed facility) have a rule that provides:

The owner or operator must demonstrate that the facility or unit will not cause or contribute to a condition of air pollution as defined in the Texas Clean Air Act

(TCAA). Such demonstration shall be based on waste characteristics, emissions estimates, and dispersion modeling and *shall be submitted as part of the permit application.*

31 Tex.Admin.Code §§ 120.31, 335.367(a)(2) (1989) (emphasis added). Finally, Houston Chemical, in its application and evidence, did not treat the heat-surge vent as a distinct and separate emissions source; hence the company made no showing of waste characteristics, emissions estimates, and dispersion modeling concerning the vent as an *independent* item. In submitting proposed findings of fact and conclusions of law to the Commission, the Air Control Board followed suit and did not treat the heat-surge vent as an independent emissions source. *See* Act § 361.-073(e)-(g).

In its findings, the Commission included the following ultimate fact: "Potential fugitive air emissions from the opening of the heat surge vent will not pose a threat to human health or the environment." This conclusion rests on the following rationale expressed in the Commission's findings of underlying fact: The vent will not open except under emergency conditions; the likelihood of an emergency will be minimized by the design of the facility; the waste-feed cutoff system will activate before the build-up of pressure reaches a level sufficient to open the heat-surge vent; and a *separate modeling analysis for the vent,* as an independent emissions source, *is unnecessary* because of the limited likelihood that the emergency heat-surge valve will ever open; however, owing "to the location of the heat surge vent [behind] the secondary combustion phase of the incineration system, the occurrence and nature of fugitive emissions resulting from an opening of the heat-surge vent will be monitored." The Commission's permit therefore requires continuous monitoring of the heat-surge vent as well as checks at fifteen-minute intervals for any emissions that might issue from the vent. If the vent should open, the permit requires that Houston Chemical notify the Board and the Commission within twenty-four hours, and provide within fifteen days a written report of the incident.

Smith, Jackson, and Harris County view as immaterial the Commission's foregoing justification regarding the heat-surge vent. They reason that Commission rule 335.367(a)(2) required three things: (1) that Houston Chemical demonstrate that the heat-surge vent "will not cause or contribute to a condition of air pollution"; (2) that any demonstration in that regard must "be based on waste characteristics, emissions estimates, and dispersion modeling" *and no other basis is sufficient for the purpose;* and (3) that the demonstration must "be submitted as part of the permit application."

We hold there was no prejudicial error. Under the Commission's rule 335.367(a)(2) and the Air Control Board's rule 120.31, the operator "must demonstrate that the *facility* or *unit* will not cause or contribute to" air pollution. (emphasis added). The emphasized words are defined in a way that *includes* equipment components such as a heat-surge valve, indicating that the requisite demonstration may be made for the facility or unit as a whole and not necessarily for each equipment component. *See* Act § 361.-003(39).

More importantly, we believe the Commission was, in all events, free to depart from a strict adherence to what Rule 335.367(a)(2) required. The rule consists of two parts. The first sentence imposes a requirement of *substance:* "The owner or operator must demonstrate that the facility or unit will not cause or contribute to a condition of air pollution." The second sentence imposes a *procedural* requirement for meeting this substantive requirement: "[s]uch demonstration must be based on waste characteristics, emissions estimates, and dispersion modeling ... submitted as part of the permit application." It is readily apparent from the face and context of the rule that the second sentence was not intended primarily to confer procedural benefits upon a party to the case; rather, it was manifestly intended as a procedural aid to facilitate the Commission's decision-making as to the first or substantive element of the rule. The Commission and the Air Control Board were therefore free to relax the "law" embodied in the second sentence and their doing so is "not reviewable

except upon a showing of substantial prejudice to the complaining party." *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970) (citation omitted); Peter Raven–Hansen, *Regulatory Estoppel: When Agencies Break their Own "Laws,"* 64 Tex.L.Rev. 1, 23 (1985); *see also Morgan Express, Inc. v. Railroad Comm'n of Texas,* 749 S.W.2d 134, 141 (Tex.App.—Austin 1987, writ denied). It does not appear that any prejudice resulted from the Commission's chosen course of proceeding in the case. We overrule the points of error.

## FINANCIAL ASSURANCE

Harris County, in its points of error three and four, and Smith and Jackson, in their point of error "I.A.2," complain that the Commission made errors of law in connection with the financial assurance that the Commission required of Houston Chemical to secure its operation and closure of the facility according to law.

We have set out the relevant parts of the Act in a footnote.[4] The Commission has by rule adopted certain federal regulations pertaining to financial assurance, unless these are clearly inconsistent with the Act. 12 Tex.Reg. 1353 (proposed) and 12 Tex.Reg. 2106 (1987) (adopted), *amended in part,* 16 Tex.Reg. 5056 (proposed) and 16 Tex.Reg. 6936 (1991) (adopted) (former 31 Tex.Admin.Code § 335.152(a)(6)). The federal regulations are found in 40 C.F.R. §§ 264.140–

.169 (1992). They provide that the owner or operator of a facility must maintain a detailed written estimate of the cost of closing the facility and give "financial assurance" that he will close the facility in accordance with the law. 40 C.F.R. §§ 264.142(a); § 276.143 (1992). In giving such assurance, the operator "must choose from" the following options: closure trust fund; surety bond guaranteeing payment into a closure trust fund; surety bond guaranteeing performance of closure; closure letter of credit; closure insurance; financial test and corporate guarantee for closure; use of "multiple financial mechanisms"; or use of a financial mechanism for multiple facilities. 40 C.F.R. § 264.143 (1992). Similar assurance is required for the post-closure care of the site. 40 C.F.R. §§ 264.144–.145 (1992). A closure-cost estimate, upon which such assurance is based, must be adjusted annually and submitted to the agency. 40 C.F.R. § 264.142(b) (1992).

The federal regulations also require "financial assurance" regarding the owner's or operator's potential liability to third parties during the course of operations. This assurance may be provided in the form of liability insurance, a financial test, a corporate guarantee, or a combination of a corporate guarantee and insurance. The coverage must include bodily injury and property damage to third parties caused by *sudden* accidental occurrences arising from operations of the facility, in the amount of at least $1 million

4. The Act provides as follows in § 361.085:

(a) Before a permit may be issued, ... the commission shall require as a part of each application information it deems necessary to demonstrate that an applicant has sufficient financial resources to operate the facility in a safe manner and in compliance with the permit and all applicable rules, including how an applicant intends to obtain financing for construction of the facility, and to close the facility in accordance with applicable rules.

....

(c) Before a permit may be issued, amended, extended, or renewed for a solid waste facility ..., the commission shall determine the type or types of financial assurance that may be given by the applicant to comply with rules adopted by the commission requiring financial assurance.

(d) Before hazardous waste may be received ... at a solid waste facility for which a permit

is issued, ... the commission shall require the permit holder to execute the required financial assurance conditioned on the permit holder's satisfactorily operating and closing the solid waste facility.

....

(f) The [commission] shall require an assurance of financial responsibility as may be necessary or desirable consistent with the degree and duration of risks associated with the processing, storage, or disposal of specified solid waste.

(g) Financial requirements established by the agency must at a minimum be consistent with the federal requirements established under the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. Section 6901 et seq.).

per occurrence with an annual aggregate of at least $2 million, exclusive of legal defense costs. 40 C.F.R. § 264.147(a) (1992). The coverage must also include "bodily injury and property damage to third parties caused by *nonsudden* accidental occurrences arising from operations of the facility ... in the amount of at least $3 million per occurrence with an annual aggregate of at least $6 million, exclusive of legal defense costs." 40 C.F.R. § 264.147(b) (1992) (emphasis added). The amounts mandated by these rules may be reduced, however, if the owner or operator demonstrates they "are not consistent with the degree and duration of risk associated with" the operations, a request in that regard being "treated as a request for a permit modification." 40 C.F.R. § 264.147(c) (1992). Similarly, the agency may adjust the required amount upward "as may be necessary to protect human health and the environment." 40 C.F.R. § 264.147(d) (1992).

In its final order, the Commission determined as follows:

1. Houston Chemical "will meet state and federal financial assurance requirements for facility closure through the use of a closure trust fund as provided in 40 C.F.R. § 264.143(a)."

2. Houston Chemical's permit requires that before receipt of any wastes the Company must fully fund the closure trust fund in the amount of $8,091,980.

3. Houston Chemical "will maintain liability coverage for sudden accidental occurrences in the amount of at least $1,000,000 per occurrence with an annual aggregate amount of at least $2,000,000, exclusive of legal defense costs, as required by the permit and as provided in 40 C.F.R. § 264.147."

The permit itself provides as follows:

1. Houston Chemical may not begin operations until it is in compliance "with all financial assurance requirements and liability requirements, to include all related [instruments] being in full force and effect"; and continued operation of the facility is contingent upon maintenance of financial assurance under the federal regulations described above.

2. Houston Chemical "shall provide financial assurance for closure in a form acceptable to the Executive Director in an amount not less than $8,091,980 (representing 1988 dollars). If a closure trust fund is utilized, the permittee shall fully fund the closure trust prior to accepting wastes for storage and/or processing at the site."

3. "The permittee shall submit to the Executive Director upon written request such information as may be necessary to determine the adequacy of financial assurance."

■ Harris County, Smith, and Jackson complain first that the trust-fund assurance required of Houston Chemical does not cover operation of the facility, but only the cost of its closure. This complaint appears to rest upon a misinterpretation of section 361.085 of the Act. Subsection (a) of that statute requires that the applicant demonstrate "sufficient financial resources *to operate the facility in a safe manner* and in compliance with the permit and all applicable rules, *including* how [the] applicant intends to obtain financing for construction of the facility, and *to close the facility* in accordance with applicable rules." Act § 361.085(a) (emphasis added). Subsection (d) requires execution of "the required financial assurance conditioned on the permit holder's satisfactorily *operating* and closing the solid waste facility." Act § 361.085(d) (emphasis added). Thus, section 361.085 of the Act distinguishes between assurances as to the cost of closing the facility and as to operation of the facility in a safe manner. This is the identical distinction made in the federal regulations that the Commission has adopted as its own. It appears to us that the Commission has clearly authorized (1) the trust fund to assure against the cost of closing the facility and (2) liability insurance to assure against claims arising from operation of the facility. We reject the contrary contention that section 361.085 of the Act requires a single form of assurance encompassing both closure costs and operations liability.

If Harris County, Smith, and Jackson intend that assurance for safe operation of the facility means something different from as-

surance against third-party liability (and this is not apparent from their brief), then we should point out that the closure-cost estimate, upon which financial assurance is based, "must equal the cost of final closure at the point in the facility's active life when the extent and *manner of its operation,* would make closure the most expensive[.]" 40 C.F.R. § 264.142(a)(1) (1992) (emphasis added). In other words, the manner of operation is a factor that must be used in calculating the closure-cost estimate, and the amount of assurance that must be given against such cost.

■ Harris County, Smith and Jackson complain next that the Commission made no findings demonstrating the "degree and duration of risks associated with" the waste-management activities, as stated in section 361.085(f) of the Act. We have outlined above the Commission's determinations relative to financial assurance. It is evident to us that the Commission set the amount of the trust fund and liability insurance at the standard levels established in the federal regulations the Commission adopted, relying upon the mechanism provided in those regulations for periodically increasing the amounts should the "degree and duration of risks" require. These regulation-based amounts are independent of the risks associated with any particular facility. We see no error in this method of complying with section 361.-085(f) of the Act in the case of a new facility.

■ Harris County, Smith, and Jackson complain that the Commission accepted the standard amounts for liability insurance, as established in 40 C.F.R. § 264.147(a), a regulation the Commission adopted. The regulation requires "*at least* $1 million per occurrence with an annual aggregate of *at least* $2 million, exclusive of legal defense costs." *Id.* (emphasis added). Harris County, Smith, and Jackson argue that actual third-party liability claims may exceed the amounts indicated; hence Houston Chemical was bound to demonstrate and the Commission was bound to determine in advance the probable amount of such future claims and calculate therefrom the required amount of liability insurance thereon. We believe it lay within the Commission's discretion to interpret dif-

ferently section 361.085 of the Act. The agency has interpreted the Act as authorizing its employment of the system established in 40 C.F.R. § 264.147(a), coupled with the provision in subsection (d) of that regulation which authorizes the agency to adjust the standard level of insurance as "necessary to protect human health and the environment," based on the agency's periodic "assessment of the degree and duration of risk associated with the ownership or operation of the facility." 40 C.F.R. § 264.147(d) (1992). We see nothing unreasonable in the Commission's interpretation of this part of the Act. *See Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 273 (1944) (noting that courts ordinarily adopt and uphold an administrator's construction of a statute, provided the construction is reasonable).

■ Harris County, Smith, and Jackson complain finally that the Commission has yet to determine "the type or types of financial assurance" required of Houston Chemical under section 361.085(a) of the Act; hence the agency order is not final and the trial court should have sustained their motion to dismiss their lawsuit for want of jurisdiction. They base this contention on the following statements made in the permit after it fixed the amount of financial assurance required of Houston Chemical:

1. "*If* a closure trust fund is utilized, the permittee shall fully fund the closure trust" before accepting wastes. (emphasis added).

2. Houston Chemical "shall provide financial assurance for closure in a *form acceptable* to the Executive Director" of the Commission. (emphasis added).

In appellants' view, the conditional sense of these statements, indicated by the emphasized words, implies that the Commission itself never determined the type or types of financial assurance required of Houston Chemical, but left that decision to the agency's executive director. We reject this interpretation of the permit. The permit purported to fix the rights of the parties under the general rules that applied to such permits. *See Sunset Express, Inc. v. Gulf, C. & S.F. Ry.,* 154 S.W.2d 860, 862 (Tex.Civ.App.—

Fort Worth 1941, writ ref'd w.o.m.). And we believe the terms of the permit must be construed in context, especially in light of the Commission's decision and order evidenced by the permit. We believe it obvious that the Commission's decision and final order plainly required utilization of a trust fund; hence the executive director's discretion was limited accordingly. The permit language quoted above must be understood as giving the executive director discretion as to the form of the trust fund tendered in satisfaction of what the final order required. His discretion did not extend, in other words, to choosing from among the *types* of financial assurance authorized in 40 C.F.R. § 264.143. We believe any other construction is artificial and unreasonable.

For the reasons given, we overrule the points of error urged by Harris County, Smith, and Jackson concerning the matter of financial assurance.

### DESIGN AND ENGINEERING

■ Smith and Jackson, in their point of error "I.A.3," and Harris County in its points of error six and thirteen, complain that the Commission made errors of law in connection with the design and engineering aspects of the facility proposed in the Houston Chemical application.

A Commission rule provides as follows: Unless otherwise stated, an application for a permit to store, process, or dispose of solid waste shall meet the following requirements.

> * * * * * *

(2) Plans and specifications for the construction and operation of the facility ... shall be submitted.... The information provided shall be sufficiently detailed and complete to allow the executive director to ascertain whether the facility will be constructed and operated in compliance with all pertinent state and local air, water, public health, and solid waste statutes.

> * * * * * *

(7) Engineering plans and specifications submitted as part of the permit application shall be prepared and sealed by a registered professional engineer who is currently registered as required by the Texas Engineering Practice Act.

31 Tex.Admin.Code § 305.50(2), (7) (Supp. 1993). The Commission found: (1) "[s]ufficient detail of design has been provided in the application and during the evidentiary hearing to determine that the proposed incineration system is capable of functioning as represented by the applicant and as required in the permit"; (2) "[t]he plans and specifications are sufficiently detailed and complete to ascertain whether the facility will be constructed and operated in compliance with all pertinent state and federal air, water, public health and solid waste standards."

Harris County, Smith, and Jackson complain the findings are erroneous because (1) the plans furnished by Houston Chemical, with its application, are not "construction plans"; indeed, at least one is marked "Not for Construction"; and (2) the plans accompanying the application were not prepared by and do not bear the seal of a professional engineer, as required by the rule quoted above.

We have examined the application. Twenty-three documents forming a part of the application are large drawings that pertain to the construction of the facility. We believe these are the documents in question. Two are marked "Not for Construction." One of these is entitled "Proposal Drawing: Rotary Kiln Incineration System," the other "Proposal Drawing: Misc. Elev. & Sections, Rotary Kiln Incineration System." Each drawing bears what purports to be the seal of a registered engineer, contrary to appellants' claim that they do not bear such a seal. What then of appellants' complaint that the plans are not sufficiently detailed and complete to meet what rule 305.50(2), (7) requires?

Implicit in appellants' argument is a premise that subsections (2) and (7) of rule 305.50 require that construction plans have the specificity and certainty such plans ordinarily have *outside* the permit process, as when an owner and builder contract for the erection of a structure in accordance with an agreed set of plans, each having a contract right of

performance according to the agreed plans. Since two of the plans are marked "Not for Construction" in this instance, they were therefore insufficient in appellants' view to meet what the rule requires. In other words, the sufficiency of the plans depends entirely upon the meaning appellants have first assigned to subsections (2) and (7) of rule 305.50. We believe the Commission was free to assign a different meaning.

The rule explicitly requires that the construction plans provide information "sufficiently detailed and complete to allow the executive director to ascertain *whether* the facility *will be* constructed and operated *in compliance with all pertinent* " *statutes.* 31 Tex.Admin.Code § 305.50(2) (Supp.1993) (emphasis added). The Commission is expected to assign meaning to its rules. We see nothing unreasonable in the meaning implicitly assigned by the Commission in this instance—that the plans must be sufficient for the regulatory purpose indicated even though they may not be sufficient for judging compliance with any contract under which the structures would be built. We may not say this is an unreasonable construction, whether the rules be viewed as "procedural," "interpretative," or "legislative." *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *Bullock v. Hewlett–Packard Co.,* 628 S.W.2d 754 (Tex.1982); *Railroad Comm'n of Texas v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1027–28 (1942).

The result is not altered, in our view, by the terms of the Texas Engineering Practice Act as urged by the appellants. Section 15(c) of that statute, upon which appellants rely, provides as follows:

> A public official of this state ... charged· with the enforcement of laws, ordinances, codes, or regulations that affect the practice of engineering may only *accept* plans, specifications, and other related documents prepared by registered engineers, as evidenced by the seal of the engineer.

Tex.Rev.Civ.Stat.Ann. art. 3271a, § 15(c) (West Supp.1994) (emphasis added).

As mentioned previously, all the drawings do bear the seal of a registered engineer. Nothing in subsection 15(c) of the statute directs that a public official of this state may only accept construction plans that are sufficiently certain to create a contract right of construction performance in accordance therewith; nothing in the statute forbids the acceptance of preliminary plans, for example, or plans offered for another purpose, such as regulation in this instance. The subsection is, instead, part of a section that deals with the registration, certification, and seals of professional engineers. Moreover, we doubt the word "accept," as used in subsection 15(c), was intended to have the meaning appellants implicitly impute to it—that the Commission "accepts" the plans in the contract sense of creating rights and obligations with their acceptance. Under the regulatory scheme, the plans, specifications, and related documents submitted with the permit application are essentially conditional and tentative and only for the purpose of initiating the application process. Even a resulting permit, when issued, creates no privilege or property right. It is subject to further Commission orders imposed unilaterally by the agency. An engineer's certification that the building complies with such permit and subsequent orders is an event that must take place after construction and a test of the structures by a "trial burn." *See* 31 Tex.Admin.Code § 305.122 (1989); 11 Tex.Reg. 272 (proposed) and 11 Tex.Reg. 2597 (1986) (adopted), *amended in part,* 15 Tex.Reg. 4793 (proposed) and 15 Tex.Reg. 6017 (1990) (adopted) (former 31 Tex.Admin.Code § 305.-144); 11 Tex.Reg. 276 (proposed) and 11 Tex.Reg. 2600 (1986) (adopted), *amended in part,* 15 Tex.Reg. 4794 (proposed) and 15 Tex.Reg. 6017 (1990) (adopted) (former 31 Tex.Admin.Code § 305.172).

We overrule the points of error.

## RECOMMENDATIONS OF THE AIR CONTROL BOARD

Harris County, in its point of error ten, and Smith and Jackson, in their point of error "I.A.4," complain the Commission made an error of law in reaching its final decision without a valid recommendation of the Texas Air Control Board. We should explain.

When the Commission receives an application for a permit to construct and operate a facility for the disposal of industrial solid waste and hazardous municipal waste, "the Texas Air Control Board shall perform a technical review of the air quality aspects of" the application. Act § 361.073(a); *see also* Act § 361.072. On completing its technical review, the Board furnishes its recommendations or proposed permit provisions to the Commission, and the Commission "shall incorporate into its proposed action all recommendations or proposed permit provisions" furnished by the Board, unless these are less stringent than certain federal requirements. Act § 361.073(c), (d). Should the "Board's proposed permit provisions conflict with provisions proposed by the [Commission] staff, the staffs of the Board" and the Commission "shall attempt to resolve the conflict before the [Commission's] technical review of the application ends." Act § 361.073(d). The Board's rules and the Commission's rules also establish this procedure. *See* 31 Tex.Admin.Code § 120.15(a) (Supp.1993) & § 335.365(a) (1989).

The Board, in making its technical review and proposals, acts neither as a tribunal nor as a mere advisor; rather, the Board is a *party* in the permit proceeding before the Commission. "If a contested case hearing is held, the ... Board shall develop and present the state's evidence and testimony concerning the air quality aspects of the application," and the Commission as a party and any other party "is entitled to cross-examine any testifying witness" from whom evidence is adduced by the Board. Act § 361.073(e). At the conclusion of the evidence, the Board must be allowed thirty days in which to submit its proposed findings of fact and conclusions of law, together with "permit language," to the Commission. Act § 361.073(f). The Commission and its hearing examiner "must accept the information submitted by the ... Board unless the [Commission] finds the recommendations of the ... Board are not supported by a preponderance of the evidence." Act § 361.073(g). Finally, the "Board may seek judicial review of the air quality aspects of the" Commission's decision in the case. Act § 361.073(h).

Harris County, Smith, and Jackson complain the Commission committed legal error when it based its final decision on recommendations made by the *staff* of the Air Control Board as opposed to recommendations made by the *Board itself.* The recommendations were enclosed with a letter signed by "Priscilla J. Falzone, Staff Attorney, Legal Division." The letter is written on Board stationery, headed "Texas Air Control Board," listing the Board chairman, vice-chairman, members, and executive director. The letter begins:

> Enclosed for filing in the above referenced matter are the Texas Air Control Board *Staff's* (TACB Staff) Proposed Findings of Fact and Conclusions of Law regarding the air quality aspects of the subject application.... Copies of the Proposed Findings of Fact and Conclusions of Law are being mailed to the other parties.

(emphasis added).

Harris County, Smith, and Jackson argue that the Board itself never made a recommendation to the Commission because the letter states, on its face, that the recommendations were those of the Board's staff; hence they could not have come from the Board or its executive director, the only authorities in whom the Act vests the power of making recommendations to the Commission. We reject the theory.

Section 361.075 of the Act provides "[t]he Texas Air Control Board may delegate to its executive director the powers and duties conferred on the board under [section 361.073]," the statute that requires the Commission to incorporate in its decisions the recommendations "submitted by the Texas Air Control Board." Section 361.075 does not refer to any *specific* power or duty the Board might delegate to its executive director. Nor does any statute, so far as we are able to find, prohibit the Board or the executive director from acting through other agency employees. In the case of a large agency like the Board, exercising statutory powers in its own technical field, it would be surprising if a court did not hold that the agency's statutory framework necessarily, if implicitly, empowers the Board and executive director to delegate further, under their ultimate control, even *dis-*

*cretionary* powers of a limited nature. *See Lipsey v. Texas Dept. of Health*, 727 S.W.2d 61, 64–65 (Tex.App.—Austin 1987, writ ref'd n.r.e.). But that issue is not before us.

Instead, we have simply a complaint that the recommendations were not an act of the Board or its executive director *because* their attorney's letter, amounting to a pleading in a contested case, described the recommendations as being those of the Board "staff." We cannot presume the attorney or the staff acted without authority given or ratified by the Board or the executive director. The attorney and the staff had at least apparent authority and they purported to act as Board employees and as Board attorney. The Board itself has not challenged their authority to act as they did. The power to engage employees and attorneys is implicit in the Board's statutory framework. *See* Texas Clean Air Act, Tex.Health & Safety Code Ann. § 382.002 & § 382.011 (West 1992); *Terrell v. Sparks*, 104 Tex. 191, 135 S.W. 519, 521–22 (1911). In these circumstances, we believe the ordinary presumption attaches to the acts of the staff and the attorney—a presumption of regularity in official acts. *See In re Laughlin*, 153 Tex. 183, 265 S.W.2d 805, 808, *appeal dismissed*, 348 U.S. 859, 75 S.Ct. 84, 99 L.Ed. 677 (1954); *Dillehay v. Texas Life Ins. Co.*, 130 Tex. 197, 107 S.W.2d 369, 370 (1937). The presumption is rebuttable, of course, but no party has contended that the attorney and staff acted without actual authority; certainly no party has introduced evidence to that effect. The presumption stands unassailed. We overrule the points of error.

## COMMISSIONER'S COMMENT

■ Smith and Jackson contend, in their point of error "I.A.5" that the Commission committed legal error by substituting a post-permit "trial-burn" procedure for a determination the agency was obliged to make before *issuing* the permit.

A federal rule adopted by the Commission requires the limited operation of a facility, a "trial burn," after construction is completed. The purpose of the trial burn is to ascertain whether the facility will actually operate as contemplated during the permitting process.

*See* 40 C.F.R. § 270.62. In the meeting in which the Commission approved Houston Chemical's application, one commissioner stated:

> You know, I really feel this has been a real difficult case. This is something that, you know, has been bothering me since when I was in the legislature as far as the hazardous waste for a while, and I've got, you know, a lot of thoughts about this, and I'm, you know—the only way I, as a layman, can figure out if this thing is going to work is to do it and go through a trial burn.

From this comment, Smith and Jackson extract an inference that "the Commission abdicated a careful pre-permit analysis of the proposed scheme and improperly rationalized that the trial burn was the only standard against which the facility needed to be measured."

We disagree with the inference. It is unnatural and without foundation in the record. The record indicates without question the pre-permit analysis made by the Commission as a party, and the numerous findings of fact and conclusions of law indicate that the Commission as a tribunal performed its duty in determining the case based on the relevant law and the evidence, all before issuance of the permit. The substance of the statement quoted above amounts simply to an expression by one Commissioner regarding the difficulty of the case and the uncertainty inherent in all estimates and predictions about future events. The second sentence of the quotation indicates the importance of the trial burn. Nothing in the quotation indicates to a reasoning mind a substitution of the trial burn for the statutory and rule-based criteria by which permits are issued under the Act.

■ In all events, "[t]he thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained by appropriate findings and conclusions that have support in the evidence." *City of Frisco v. Texas Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.); *see also United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). The Commis-

sion's final decision purports to rest solely on the findings of fact and conclusions of law that accompany the decision. We must judge the validity of the decision according to the basis upon which it purports to rest. *Professional Mobile Home Transp. v. Railroad Comm'n of Texas,* 733 S.W.2d 892, 904 (Tex.App.—Austin 1987, writ ref'd n.r.e.). We therefore overrule the point of error.

### FLOOD–PLAIN ELEMENT

 In their point of error IV.A.6, Smith and Jackson contend the Commission committed legal error with respect to a small part of the facility premises that might fall within a 100–year flood plain.

Section 361.104 of the Act directs the Commission as follows:

The commission by rule shall prohibit the issuance of a permit for a new hazardous waste management facility ... if the facility is to be located in an area *determined to be unsuitable* under rules adopted by the commission under Section 361.103 unless the design, construction, and operational features of the facility will prevent adverse effects from unsuitable site characteristics.

(emphasis added). Section 361.103 directs that the Commission shall by rule "define the characteristics that make [certain] areas *unsuitable* for a hazardous waste management facility." (emphasis added). The rule must include consideration of the following factors: "(1) flood hazards; (2) discharge from or recharge to a groundwater aquifer; (3) soil conditions; (4) areas of direct drainage within one mile of a lake used to supply public drinking water; (5) active geological processes; (6) coastal high hazard areas, such as areas subject to hurricane storm surge and shoreline erosion; or (7) critical habitat of endangered species." Act § 361.103(1)–(7).

Accordingly, a Commission rule elaborates upon the foregoing in detail. The rule includes the following provision:

A storage or processing facility ... may not be located in the 100–year flood-plain unless it is designed, constructed, operated, and maintained to prevent washout of any hazardous waste by a 100–year flood.

11 Tex.Reg. 450 (proposed) and 11 Tex.Reg. 2347 (1986) (adopted), *amended in part,* 16 Tex.Reg. 4220 (proposed) and 16 Tex.Reg. 6070 (1991) (adopted) (former 31 Tex.Admin.Code § 335.204). Another Commission rule provides:

The commission shall not issue a permit for a new hazardous waste management facility ... if the facility ... does not meet the requirements of § 334.204 of this title (relating to Unsuitable Site Characteristics.)

If we understand the evidence correctly, the 100–year flood-plain boundary corresponds, in the vicinity, to the seventeen-foot contour above mean sea level. All of Houston Chemical's tract is above the contour except for a drainage ditch. The ditch runs parallel to the southern property line and drains to the west. The ditch traces a path between the southern property line and a security fence to be erected about thirty-five feet from that line. The fence will be six feet in height, made of chain link and multiple strands of barbed wire on top. The fence will enclose all operating parts of the facility. About forty feet inside the fence will be a rail line and a "Railcar Unloading Facility," the rail line being basically parallel to the fence. The rail line crosses the drainage ditch at a point on the southeast corner where the line leaves the tract.

The Commission found as follows:

The proposed facility will be designed, constructed, operated and maintained to prevent the washout of any hazardous waste by a 100–year flood event.

(1) No waste management units ... will be located in the 100–year floodplain.

(2) Permit *Provision II.B.29* has been modified to preclude utilization of the proposed Railcar Unloading Area by providing:

"Notwithstanding all permit provisions to the contrary, the Railcar Unloading Area at this facility is specifically prohibited from use unless the permittee submits evidence as part of a major permit amendment which indicates the subject area is either out of the 100–year floodplain or can be protected from washout by a 100–year flood."

Secondary containment at the facility, as well as the design, construction and operational features of the facility, will preclude migration to surface water of any waste from spills, leaks or discharges.

\* \* \* \* \* \*

The proposed facility will meet the federal locational standards for hazardous waste management facilities incorporated into 31 TAC § 335.152(a)(1).

\* \* \* \* \* \*

The proposed facility will be designed, constructed, operated and maintained to prevent the washout of any hazardous waste by a 100–year flood event.

(emphasis in original). From these fact findings, the Commission concluded:

The site selected for the facility, when evaluated in light of proposed design, construction, and operational features, including secondary containment, will prevent adverse effects from any unsuitable site characteristics and will reasonably minimize possible contamination of surface water and groundwater and otherwise complies with applicable siting criteria.

Smith and Jackson contend Houston Chemical "never made *any* showing that its proposed facility incorporated special design, construction or operational features that would guard against flooding at its site." This contention is incorrect. The site plan demonstrates that no operational equipment or activities will be situated within the drainage ditch, evidently the only part of the tract that lies within the 100–year flood plain. Indeed, the ditch lies outside the security fence so as to separate it from the operating parts of the facility. Additionally, the plan is replete with various dykes as a protection even above the seventeen-foot contour. The evidence was uncertain about where the seventeen-foot contour line existed, on the ground, near the Railcar Unloading Facility; consequently the agency order forbade its use until the location of the contour line was established with certainty in that part of the tract. We overrule the point of error.

## FORMER COMMISSION EMPLOYEE'S PARTICIPATION IN THE CONTESTED CASE

■ Harris County, in its point of error five, and Smith and Jackson, in their point of error "I.A.7," complain the Commission committed an error of law by allowing its former executive director to participate in the contested case as counsel for Houston Chemical.

Mr. Larry Soward began serving as executive director for the Commission on September 1, 1985. On August 26, 1986, Houston Chemical filed its application for the permit we now review. The Commission staff did not complete its technical review within the 120 days required by agency rule. *See* 31 Tex.Admin.Code § 281.19(a) (1989). The staff requested that the executive director, Mr. Soward, allow an extension of time to perform the review. *See* 31 Tex.Admin.Code § 281.20 (1989). The request was granted, evidently by Mr. Soward. We cannot find in the record any documentation for the foregoing; it is taken from the 1989 testimony given in the contested case by a Commission employee. The testimony does not indicate that anyone opposed the extension of time. The event must have occurred in late 1986, or a date well before August 27, 1988, when notice of the application was first published. The event also occurred before the application was forwarded to the Commission itself for filing, setting, and the giving of notice to persons who might be affected. *See* 31 Tex.Admin.Code § 281.22(a) (1989). In other words, the extension was given, in all likelihood, before the case had become contested.

Mr. Soward left the Commission's employment December 4, 1987. He was subsequently retained as counsel by Houston Chemical. In 1990, the legislature amended the Act by adding section 361.0885 which provides:

(a) After providing an opportunity for a hearing to an applicant, the [Commission] shall deny an application for the issuance ... of a permit within its jurisdiction and may not issue ... the permit if the [Commission] determines that a former employee:

(1) participated *personally and substantially* as a former employee in the [Commission's] review, evaluation, or processing of that application before leaving employment with the [Commission]; and (2) after leaving employment with the [Commission], provided assistance on the same application for the issuance . . . of a permit, including assistance with preparation or presentation of the application or legal representation of the applicant.

Act § 361.0885 (emphasis added). The amendment became effective September 6, 1990, or about twenty months after Mr. Soward left the Commission's employment.

We believe the Commission did not err in concluding that the application had been properly processed, even assuming the statute applied retroactively to the case. The agency could, in our view, reasonably conclude that Mr. Soward's participation was neither *personal* nor *substantial* in the sense of the statute.

Harris County, Smith, and Jackson argue to the contrary on two grounds. They argue that merely holding the office of executive director amounts to participating in the case "personally and substantially." We disagree with this interpretation of section 361.0885. Under that theory, the words "personally and substantially" are drained of any actual meaning; the provision for a hearing would be superfluous for the disqualification would be absolute and categorical; and there is no indication in the statute that the legislature intended to make distinctions based upon a former employee's official position. Harris County, Smith, and Jackson argue alternatively that granting the staff its requested extension of time was a personal and substantial participation in the case as a matter of fact. We disagree, as indicated above. The participation was no doubt personal, but the Commission could reasonably conclude it was not substantial in the circumstances indicated. We overrule the point of error.

### FAILURE TO MAKE REQUIRED FINDINGS

In their point of error "I.B.1," Smith and Jackson contend the Commission erred in issuing the permit when the agency had not made findings on all requisite statutory criteria.

Section 361.109(a)(1) of the Act provides "[t]he commission may grant an application for a permit . . . for a hazardous waste management facility if it finds that . . . the applicant has provided for the proper operation of the proposed hazardous waste management facility." This statutory provision thus calls for an ultimate conclusion by the agency. The agency order contains the substance of this ultimate conclusion, expressed as conclusions of law. For example, conclusion of law number seven states: "The proposed incinerator and associated facilities have been designed and will be constructed, operated, and maintained in accordance with applicable Commission and [Texas Air Control Board] regulations." Similar determinations are expressed as conclusions of law with respect to all aspects of the proposed facility.

Section 361.023 of the Act sets out the legislative objectives and related public policy regarding hazardous waste by providing:

(a) To protect the public health and environment, it is the state's goal, through source reduction, to eliminate the generation of hazardous waste to the maximum extent that is technologically and economically feasible. Therefore, it is the state's public policy that, in generating, treating, storing, and disposing of hazardous waste, the following methods are preferred to the extent economically and technologically feasible, in the order listed:

(1) source reduction;

(2) reuse or recycling of waste, or both;

(3) treatment to destroy hazardous characteristics;

(4) treatment to reduce hazardous characteristics;

(5) underground injection; and

(6) land disposal.

(b) Under Subsection (a)(3), on-site destruction is preferred, but it shall be evaluated in the context of other rele-

vant factors such as transportation hazard, distribution of risk, quality of destruction, operator capability, and site suitability.

Smith and Jackson argue the Commission's final order does not contain "any findings regarding the economic and technological feasibility of alternative methods of waste treatment and disposal of higher preference than incineration under State law"; and does not contain findings that pertain to the various factors listed in subsection (b) of the statute.

We observe that the legislature has required that these objectives and considerations be effectuated generally, and left to the Commission's discretion the particulars of how to effectuate them. There is, for example, no statutory requirement that the various factors must be determined before a permit may issue in any contested case. Moreover, it does not appear that a dispute existed between the parties with regard to any of the factors listed in subsections (a) and (b) of the statute. The function of agency fact findings is to resolve factual disputes. In the absence of a factual dispute about the indicated factors, we do not see how the Commission can logically be faulted for failing to make fact findings.

Accordingly, we overrule the point of error.

## DECISION BASED ON NON–STATUTORY FACTORS

■ Harris County, in its point of error ten, and Smith and Jackson, in their point of error "I.B.2," complain the Commission abused its discretion by basing its decision in the case on a non-statutory factor—a public need factor. *See Public Util. Comm'n v. South Plains Elec. Co-op*, 635 S.W.2d 954, 957 (Tex.App.—Austin 1982, writ ref'd n.r.e.). Consequently, they contend, we must reverse the agency decision and remand the case to the agency. *See* APA § 2001.174(2)(F).

The Commission determined as follows in its findings of fact:

14. There is an existing and projected demand for the proposed hazardous waste management facility.

(a) Incineration is a preferred waste management technology under both state and federal legislation.

(b) The proposed facility is intended to serve area industry.

(c) The proposed facility will provide additional treatment capacity necessary to meet the existing and projected demand resulting from the implementation and promulgation of new hazardous waste regulations.

Moreover, one of the Commissioners declared in a hearing as follows:

It's also apparent that there is a need for additional incineration facilities in the state. We see that every day really in our hazardous waste program. I think that our capacity assurance study is in the record and all of the supporting information, and having been involved with the preparation of that document—its an ongoing process—I can say that from my own experience there is an [sic] need for additional incineration and other treatment capacity in this state even after we implement what I hope will be a very successful waste reduction program.

Another Commissioner stated as follows at the hearing: "I think there's a need for incinerators. I personally think that an incinerator is the way to go in hazardous waste."

We are reluctant to attribute to the Commissioners' comments the meaning imputed to them by Harris County, Smith, and Jackson. It appears to us that the statements refer to incineration as a preferred method of waste disposal. Nevertheless, for the purpose of discussing the points of error, we will assume that the Commissioners' comments and finding of fact fourteen represent, as Harris County, Smith and Jackson claim, the imposition of a public-need requirement that must be met before the Commission may issue a permit of the kind in dispute. A finding to that effect is, of course, a familiar licensing prerequisite found in a variety of regulatory statutes.

Shortly before the hearing in which the Commissioners spoke, and before their deci-

sion in the case, the following amendment to the Act became effective:

(a) To protect the public health and environment, encourage economic development, and assure the continuation of the federal funding for abandoned facility response actions, it is the state public policy that *adequate capacity* should exist for the proper management of industrial and hazardous waste generated in this state.

Act § 361.0231(a) (emphasis added). The question of the need for a proposed facility might arise under this statute as an issue in a permit proceeding and require the Commission's determination. We cannot agree, therefore, that the Commission erred to the appellants' prejudice in finding of fact fourteen. If a dispute arose about whether the facility was necessary, the agency resolved the issue in finding of fact fourteen; if no issue arose in that regard, then the finding is mere surplusage. Indeed, it is difficult to understand an opposing party's prejudice when the agency imposes an additional, non-statutory requirement upon the *applicant* and finds the requirement satisfied. *Cf. South Plains Elec. Co-op.*, 635 S.W.2d at 956–57 (losing applicant complains of agency decision in favor of competing applicant based on non-statutory factor); *Vandygriff v. Sabine Valley Sav. & Loan Ass'n*, 613 S.W.2d 523, 525–26 (Tex.Civ.App.—Austin 1981, writ ref'd n.r.e.) (losing applicant complains of agency decision in favor of competing applicant, based on non-statutory factor, but not shown that such was basis of agency decision); *Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex.Civ. App.—Austin 1979, writ ref'd n.r.e.) (application denied based on non-statutory factor imposed on losing party). We find no error. If we are mistaken in that regard, however, we hold any error was not prejudicial. *See* APA § 2001.174(2).

## LEGAL CRITERIA NOT IDENTIFIED IN CONCLUSIONS OF LAW

 In several "findings of fact" and conclusions of law, the Commission stated its determination that various aspects of the application satisfied federal or state requirements. The agency did not, however, specify the particular statute or regulation that imposed the requirement in question. For example, the Commission determined:

The trial burn requirements specified in the application and permit satisfy state and federal requirements and are sufficient to demonstrate whether the incinerator system is capable of achieving applicable performance standards.

This determination is designated "finding of fact" number seventeen; however, it is patently a conclusion of law for it declares a legal effect or consequence. Indeed, when an agency declares a legal requirement satisfied, it *necessarily* states a conclusion of law. *See* John Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases*, 16 Tex. Tech.L.Rev. 475, 476–83 (1985).

Harris County complains, in its point of error seven, that the Commission committed legal error in failing to identify in its conclusions of law the particular statute or regulation that the Commission deemed satisfied. Jackson and Smith make the same complaint in their point of error "I.B.2." Because the Commission's determinations are all inherently conclusions of law, the issue reduces to whether the Commission was legally required to cite each particular statute or regulation the agency believed was satisfied, because a general reference, such as "trial burn" requirements, was insufficient in the appellants' view.

We find no authority for the position taken by Harris County, Jackson, and Smith. We cannot find that the Commission labored under a legal duty of the kind for which they contend. Section 2001.141(d) of the APA does not impose such a duty. That statute requires a statement of the conclusions of law upon which the agency reached its decision; and it requires a statement of the underlying *facts* from which the agency inferred its conclusions of law or "findings set forth in statutory language," but the statute does not even remotely suggest the requirement advocated by Harris County, Jackson, and Smith. And while they imply such a requirement exists, they cite no authority for it. Such a requirement would be impractical

in our view and contrary to the established rule that a reviewing court, in cases of substantial-evidence review, is bound to affirm the agency order "if it is correct on any theory of law applicable to the case, ... whether or not the [agency] gives a correct legal reason for such order, or whether or not it gives any reason at all therefor." *Gulf Land Co. v. Atlantic Ref. Co.*, 134 Tex. 59, 131 S.W.2d 73, 84 (1939) (distinguishing between the legal basis for an agency order and its factual basis). We overrule the points of error.

## COMMISSION'S FAILURE TO ADOPT THE HEARING EXAMINER'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

Smith and Jackson complain in their point of error "I.B.2" that the Commission omitted to explain its failure to adopt the findings of fact and conclusions of law proposed by the hearing examiner. They do not, however, point to any particular fact finding or conclusion of law; they do not suggest how they were prejudiced in the matter; and they cite no authority for their claim of error, so that we might perhaps infer whether they complain of something involving witness credibility, agency policy, or another relevant factor. We overrule the point of error. *See* Tex. R.App.P. 74(d), (f).

## POST–HEARING INCLUSIONS IN THE PERMIT

Smith and Jackson complain in their point of error "I.C.1" that they were denied a hearing on several critical issues because two major provisions were included in the permit after the hearings closed.

The first item involves the trial-burn elements of the permit. In this connection, Smith and Jackson refer us to the transcript of the Commissioners' hearing held, after close of the evidence, on October 10, 1990. The record reflects the following changes ordered in the permit after the close of the evidence:

1. An independent laboratory acceptable to the Commission must conduct the trial-burn analyses, in lieu of Houston Chemical's doing so.

2. Each of the three phases of the trial burn must be limited to ninety-six hours of operation, or a total of 288 hours in lieu of the 720 hours permitted by federal regulations. After each phase, operation will cease for a period of sixty days to allow for analyses by the approved laboratory, a report to the Commission, and any Commission request for additional information.

3. After the last phase, operations may commence unless the trial-burn analyses and information indicate that the facility has not satisfied the performance standards set in the permit, in which case the permit itself would require the suspension of operation.

The foregoing altered the ordinary practice in which operations might continue until modifications of the permit had been ordered, a process that usually requires many months. Houston Chemical carried the burden to request and obtain modifications of the permit within the specified period.

Smith and Jackson do not suggest how the foregoing inclusions in the permit work to their prejudice; the inclusions appear rather to favor their positions. Indeed, Houston Chemical states that the provisions were included at the request of Smith and Jackson, a statement they do not deny. We cannot find any error because the inclusions appear to be matters of administration of the trial burn that the Commission might impose unilaterally in its discretion. Smith and Jackson suggest, if we interpret their complaint with the utmost liberality, that the Commission abused its discretion by not holding an evidentiary hearing with regard to the inclusions. They do not, however, suggest how or why this failure was an abuse of discretion. That is to say, they have shown neither error nor prejudice. We overrule the point of error. *See* APA § 2001.174(2)(F).

The second item involves the financial assurances required in the permit. Smith and Jackson contend the requirement is "open ended," apparently because it arguably authorizes Houston Chemical to utilize something other than a trust fund as security. The requirement is not "open ended." We

have discussed the matter previously. We overrule the point of error.

## NOTICE DEFECTS

■ Section 361.067 of the Act, entitled "Review of Permit Application by Other Governmental Entities," requires that the Commission mail a copy of complete permit applications to various public offices and officials. Smith and Jackson complain, in their point of error "I.C.2," that the Commission violated this statute because a notice was insufficient. Section 361.067 does not deal with notice. However, the particulars of their complaint indicate that they perhaps intend to complain of the alleged violation of another statutory provision. We believe they might intend Section 361.0665 of the Act. We proceed accordingly.

Smith and Jackson complain that Houston Chemical "failed to notify the owner or owner of the tract of land immediately adjacent to, and west of, the property upon which the [company] proposes to build its facility." Section 361.0665(b)(2) of the Act directs that the published notice required by that statute include "a statement that a person who may be affected by the facility or proposed facility is entitled to request a hearing," but the statute does not require the applicant otherwise to notify anyone other than by the indicated method of *publication.* In all events, we do not comprehend how Smith and Jackson could be prejudiced by a failure to notify another person. *See* APA § 2001.-174(2).

Smith and Jackson complain that Houston Chemical's application is deficient because it "does not contain a map showing the ownership of all tracts of land near the proposed facility," as required by 31 Tex.Admin.Code § 305.45(a)(6)(D) (1989). Smith and Jackson do not indicate how the alleged omission prejudiced them. *See* APA § 2001.174(2).

Smith and Jackson complain that Houston Chemical "was allowed to introduce evidence concerning geologic and groundwater monitoring issues which had not been addressed in the application and therefore never properly noticed [sic]." Again, they do not suggest how the asserted irregularity prejudiced them. *See* APA § 2001.174(2).

Finally, Smith and Jackson complain that "[t]he Commission also failed to comply with the notice provisions of [APA § 2001.057] in that the notice of the hearing did not contain the times and places to which the hearing could be continued." They do not suggest how they were prejudiced, however, by the omission of which they complain in this instance. *See* APA § 2001.174(2).

Aside from the terms of section 361.0665 of the Act, to which we believe they refer, and rule 305.45(a)(6)(D), Smith and Jackson refer to no authority that imposed a duty upon the Commission that they claim has been breached. The record indicates that notice was given in accordance with the publication requirements of section 361.0665 of the Act; and it indicates moreover that the owners of abutting tracts were shown on the map as section 305.45(a)(6)(D) of the Commission's rules required. In all events, Smith and Jackson have not demonstrated the prejudice necessary for us to reverse the agency order. We therefore overrule the point of error. *See* APA § 2001.174(2).

## ACT IN EXCESS OF COMMISSION AUTHORITY

■ Section 361.071 of the Act authorizes a single permit for a facility *unless* "a permit is required under the new source review requirements of Part C or D, Title I, of the federal Clean Air Act (42 U.S.C. Section 7401, et seq.) for a major source or a major modification." Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, Tex.Gen.Laws 2230, 2630 (Tex. Health & Safety Code Ann. § 361.071(a) (since amended)). Smith and Jackson complain in their point of error "I.C.3" that the Commission purported to determine the application of these federal requirements to the proposed facility and attempted to authorize its operation when a separate permit is required under the terms of the federal statute. Harris County raises the same contention in its point of error eleven.

In its conclusion of law twenty-two, the Commission determined as follows:

The proposed facility is not a major source or major modification for which a permit

would be required under the new source review requirements of Part C or D of Title I of the Federal Clean Air Act. Properly understood, this simply indicates the Commissioners' determination that *they* did not view the federal requirements as a barrier to *their* issuance of the permit requested. It manifestly was not and could not be a determination that was res judicata of the issue and therefore binding upon the federal government. We overrule the point of error.

## MISCELLANEOUS PROCEDURAL ERRORS

■ In their point of error "1.C.4," Smith and Jackson complain of various other alleged errors. They complain first that the Commission failed to include in its decision a ruling on proposed findings of fact submitted by the City of LaPorte and Harris County. We hold Smith and Jackson have no standing to raise this complaint and were not prejudiced by the claimed error. In all events, it is not shown that the proposed findings were made pursuant to a Commission rule that required the hearing officer's permission or request before findings of fact might be proposed. *See* 13 Tex.Reg. 3584 (1988) (adopted), *amended in part,* 15 Tex.Reg. 6922 (1990) (proposed) and 16 Tex.Reg. 2885 (1991) (adopted) (former 31 Tex.Admin.Code § 269.2). Section 2001.141(e) of the APA requires a ruling by the Commission on proposed findings of fact only when these are submitted "in accordance with agency rules." The record does not demonstrate compliance with the agency rule in this instance.

Smith and Jackson complain next that the Houston Chemical application was not signed and certified as required by rule 305.50(10). 12 Tex.Reg. 1300 (proposed) and 12 Tex.Reg. 2102 (1987) (adopted), *amended,* 16 Tex.Reg. 6061 (1991) (adopted) (former 31 Tex.Admin.Code § 305.50(10)). We find the application to be signed and certified in accordance with the rule.

■ Smith and Jackson complain the Commission erroneously denied a continuance requested by Jackson based on his membership in the House of Representatives and the terms of section 30.003(b) of the Civil Practice and Remedies Code. That statute provides as follows:

> Except as provided by Subsection (c), at any time within 30 days of a date when the legislature is to be in session, at any time during a legislative session, or when the legislature sits as a constitutional convention, the *court* on application *shall continue* a case in which a party applying for the continuance or the attorney for that party is a member of the legislature and will be or is attending a legislative session. The court shall continue the case until 30 days after the date on which the legislature adjourns.

Tex.Civ.Prac. & Rem.Code Ann. § 30.003(b) (West 1986) (emphasis added). Subsection (a) declares that the section "applies to any criminal or civil suit," and "any matters ancillary to the suit." Tex.Civ.Prac. & Rem.Code Ann. § 30.003(a) (West 1986). Subsection (d) requires that the application for continuance be supported by an affidavit filed "with the court" stating the grounds for continuance. Tex.Civ.Prac. & Rem.Code Ann. § 30.003(d) (West 1986). The statute clearly applies to a judicial proceeding in a "court." The parties join issue on whether the statute also applies to a contested-case proceeding in the Commission. We hold it clearly does not.

The Commission is not a court. It is simply an administrative agency, exercising *executive powers* in the executive branch of government, to which the legislature has delegated power to decide issues of fact and law in enforcing statutes entrusted to the agency's administration. The terms of APA §§ 2001.051–.178 require that these decisions be made, in cases like the present, *in a manner* much like a court employs in adjudicating cases within its *judicial power.* This similarity of method does not, however, make the agency a court in any sense. When an agency decides a contested case, it simply decides the application of a statute to the facts of a case, either directly or through the medium of the agency's rules and policies, for purposes of administrative decision-making and action. *See Missouri, K. & T. Ry. of Tex. v. Shannon,* 100 Tex. 379, 100 S.W. 138, 141 (1907); *American Sur. Co. of N.Y. v. Mays,* 157 S.W.2d 444, 448 (Tex.Civ.App.—

Waco 1942, writ ref'd w.o.m.). We overrule the point of error.

Smith and Jackson complain the Commission erred in assessing against Harris County and the City of LaPorte a percentage of the transcription costs. Harris County raises the same complaint in its point of error eighteen. The transcription costs totalled $29,656.36. The Commission assessed these costs 82% to Houston Chemical, 14.31% to the City of LaPorte, and 3.67% to Harris County, based on four factors and sets of fact findings set out in the final order. Smith, Jackson, and Harris County argue the assessment against Harris County and the City of LaPorte was erroneous because these entities enjoy governmental immunity from liability and, in all events, the Commission's office of hearing examiners ordered the transcription and not they.

Section 2001.059 of the APA provides for the transcription of proceedings on the request of *any* party. "A state agency may pay the cost of a transcript or assess the cost to one or more parties." APA § 2001.059(b). Harris County and the City of LaPorte were, at their own request, admitted to the proceeding as parties. We believe they thereby waived any claim of immunity from liability. *See Parker County v. Spindletop Oil & Gas Co.*, 612 S.W.2d 944, 949 (Tex.Civ.App.—Fort Worth 1981), *aff'd in part*, 628 S.W.2d 765 (Tex.1982). Section 2001.059(b) of the APA plainly vests in the Commission power to assess the costs among the parties admitted to the contested case. No basis is claimed or shown for holding that the Commission's assessment was an abuse of discretion, either in the ordering of the transcription or in the distribution made of the resulting costs. We overrule the complaint.

## WANT OF SUBSTANTIAL EVIDENCE

Smith and Jackson contend the Commission's findings of fact are not reasonably supported by the evidence in various particulars.

Under point of error "II.A," Smith and Jackson complain there is no evidence to support the assumptions upon which the emissions estimates were based. They argue as follows:

(1) Houston Chemical's evidence included data from a previous study that were not really comparable, in certain technical respects, in calculating its estimates for NOx [sic] generation in the proposed incinerators.

(2) The "scrubbers" proposed by Houston Chemical were not proven technology.

(3) The academic training of an expert witness who testified about the scrubbers included only a "minor" in engineering.

(4) The data obtained from a previous owner of the incinerator were not technically appropriate for use as contemplated by Houston Chemical.

(5) Certain data obtained by Houston Chemical from a study in Germany and another in Louisiana were not appropriate in light of Houston Chemical's intended equipment.

We believe these complaints plainly are directed at the weight proper to be given such evidence in arriving at the Commission's numerous findings pertaining to emissions estimates. We are expressly prohibited to substitute our own "judgment for the judgement of the state agency on the weight of the evidence on questions committed to agency discretion." APA § 2001.174. We overrule the complaints.

Under point of error "II.B," Smith and Jackson challenge the evidentiary bases of the Commission's findings that a trust fund in the amount of $8,091,980 would satisfy Houston Chemical's financial-assurance requirements. Specifically, they complain as follows:

(1) The Act requires consideration of the degree and duration of the risks associated with management of the facility, and there is no evidence regarding that factor. Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, 1989 Tex.Gen.Laws 2230, 2634 (Tex. Health & Safety Code Ann. § 361.085(d), since amended).

(2) There is no evidence of the financial assurance necessary to assure satisfactory *operation* of the facility.

(3) Houston Chemical has a negative net worth of about $250,000 and intends to fund construction of the facility from the revenues it will receive by accepting hazardous waste that it will store on the site pending completion of the facility.

(4) The provisions of 40 C.F.R. § 264.-147(a) (1992) require that Houston Chemical "demonstrate financial responsibility for bodily injury and property damage to third parties caused by sudden accidental occurrences arising from operations of the facility," yet there is no evidence indicating what the amount of such liability might be.

We have previously set out the Commission's findings concerning the matter of financial assurances. The four complaints brought by Smith and Jackson, as set out above, are merely corollaries of the complaints discussed above and depend upon the same arguments we have previously rejected. We therefore overrule the four complaints.

In point of error "II.C," Smith and Jackson contend there is no evidentiary support for key design aspects of the proposed incineration system. Harris County brings the same complaint in its points of error thirteen, fourteen, fifteen and seventeen. The specific complaints are:

(1) Houston Chemical intends to install a used fluidized-bed incinerator that is rusting and in a state of disrepair. There is no evidence regarding Houston Chemical's plans for refurbishing the incinerator or its ability to do so.

(2) There is no evidence regarding the physical connection between the rotary kiln and the fluidized-bed incinerator. The sufficiency of that connection cannot be evaluated without information demonstrating the piping configurations, duct-work dimensions, type of turns, materials to be used, and exactly how gases from the rotary kiln will be introduced into the fluidized-bed incinerator.

(3) A damping system, allowing isolation of the rotary kiln from each of the two fluidized-bed incinerators, is essential but the character of that system is not shown in the evidence.

(4) Most of the evidence about the system consists of testimony given by interested parties—the president of Houston Chemical and vendors of the equipment to be used.

▆ We believe item four plainly requires a judgment on the weight of the evidence, a judgment we are forbidden to make; perhaps all four require this impermissible judgment. See APA § 2001.174. The remaining items (1), (2), and (3) have reference, in any event, to the following determinations made by the Commission: "The proposed incinerator system, based on its design and operational features, is *capable of functioning* ... as required by applicable state and federal regulations" and the permit; sufficient detail of design has been provided to make that determination; the technology required by the design is proven to be effective, the only innovative aspect being the combination of the two types of incinerator systems; the entire "system *is capable of achieving* a minimum destruction removal efficiency ... of 99.99% of the organics processed"; the permit requires continuous monitoring of twenty-eight (listed aspects) and automatic cut-off systems (with specified "parameters"); and "[t]hose aspects of the proposed system which are currently in existence and in need of extensive repair prior to operation *are capable of* rehabilitation." (emphasis added).

The evidence includes a drawing entitled "Proposed Waste Incinerator Equipment Arrangement Drawing." The drawing shows a connecting duct between the rotary kiln and the fluidized-bed incinerators. The duct is about sixteen feet in diameter and is labeled "Refractory Lined Duct (New)." It is a straight-line connection between the rotary kiln and the fluidized-bed incinerators. The rotary kiln itself is slanted downward toward the fluidized-bed incinerators; in addition, the higher end of the rotary kiln has an opening labeled "Bulk Solids Feed System" and a mechanism entitled "Ram Feeder." Another drawing included in the evidence is entitled "Proposed Piping & Instrument Diagram: Fluidized Bed Incinerator." It shows

the fluidized-bed incinerators in section, indicating the insulation and numerous piping arrangements and pipe dimensions for the beds in general and the connecting duct to the rotary kiln. The record also indicates that the equipment used in the facility, whether new or used, will meet the operational demands of new equipment. One condition of the permit is that the equipment in the facility operate properly and without resulting in violations of applicable laws and regulations. From the foregoing summary and other evidence in the record, we cannot conclude that the Commission's findings are unreasonable inferences from such evidence, as we understand that evidence, much of which is technical in nature.

It is contended that the Commission's findings are not supported by substantial evidence because the finding of ninety-nine percent destruction-removal efficiency requires supporting information regarding three factors not shown in the evidence. They are (1) the proposed length of time the waste will be in the fluidized-bed incinerators, (2) the proposed temperature therein, and (3) the amount of oxygen proposed to burn the waste. These are not shown, it is argued, in the evidentiary record. Expert witnesses testified, however, that the designed incinerators *would* in their opinion achieve the efficiency figure indicated, given the nature of the waste to be burned and the design and planned operations. We believe the complaint pertains to the weight of the evidence, a matter we are forbidden to judge. *See* APA § 2001.174.

Harris County complains the Commission's fact findings are not supported by substantial evidence because of the used condition of the fluidized-bed incinerators and the want of construction plans sufficient for erecting the structures. We have discussed these matters previously. We believe they pertain to the weight of the evidence. APA § 2001.174.

Harris County also complains the Commission's findings regarding emission predictions are without substantial evidence in support thereof because the "emission rates on which the permit is based were ... never admitted for the truth thereof," but only to demonstrate how an expert witness reached his opinion. The findings were based on the opinion. In our view, the weight of the expert's opinion evidence might well vary with the supporting information upon which that opinion is based, but the absence of the supporting information does not deprive his opinion of probative force; rather his opinion remains in the body of evidence from which findings might be made by the agency. There is no contention that the opinion evidence itself is insufficient to support the findings. We believe this complaint pertains as well to the weight of the evidence and we may not substitute our own judgment in that regard for the judgment of the agency. *See* APA § 2001.174.

■ Next, Harris County complains of a want of substantial evidence to support the Commission's findings that the estimated emissions rates were properly computed. This is so, Harris County contends, because no technical evidence was introduced to prove the sufficiency of the proposed packed scrubbers. A witness testified explicitly that his employer would provide scrubbers sufficient to achieve a ninety-nine percent removal efficiency. Harris County complains that his opinion amounts to no evidence because certain essential underlying factors were not established by evidence: the proposed oxidizing agent, reducing agent, and height of the transfer unit for the secondary packed scrubber. Harris County concedes these facts were included in parts of the Houston Chemical *application*, but that part of the application was not *introduced in evidence*. We believe the Commission could reasonably conclude that the testimony of the witness had reference to the design and operating particulars proposed in the application when he gave his opinion that his employer would supply scrubbers sufficient to achieve the efficiency rating mentioned above. The application itself did not have to be introduced in evidence because it did not tend to prove or disprove any material issue.

Finally, Harris County complains of a want of substantial evidence to support the Commission's findings regarding emission levels predicted in the application because no evidence showed that the cyclone design was "viable." The Commission's findings were

based on opinion testimony given in light of the particulars of the designs and operations set out in the application. The complaint therefore goes to the weight of the evidence and we may not substitute our own judgment for the expert judgment of the Commission in that regard. *See* APA § 2001.174.

For the reasons given, we overrule the points of error complaining that the Commission's fact findings are not supported by substantial evidence.

## EX PARTE COMMUNICATIONS

In a hearing held September 11, 1990, one commissioner stated:

Can you go over just a little bit the aspects of the trial burn? In the last three or four weeks, I have asked some generic questions of our staff and went and visited some incinerators—and just on what a trial burn really is and how it works.

■ Harris County contends in its point of error eight that the Commissioner's ex parte communications with the agency staff violated the county's due process rights under the state and federal constitutions, and that section 2001.061 of the APA is unconstitutional in purporting to authorize agency heads to communicate with their staff in that manner for the purpose of utilizing the staff's special skills or knowledge in evaluating the evidence.

■ The procedural rights encompassed by due process of law are generally recognized to be as follows: notice of hearing; the opportunity to present argument and evidence and to rebut and test opposing evidence and argument by cross-examination or other appropriate means; appearance with counsel; and a decision by a neutral decision maker based on evidence introduced into the record of the hearing. Bernard Schwartz, *Administrative Law* § 5.1 at 203 (2d ed. 1984). The terms of the APA establish these rights as statutory rights, irrespective of whether they are constitutionally required. "The consequence has been a virtual judicialization of the administrative process [and agency] procedure has acquired many of the attributes of courtroom procedure." *Id.* The fact that these rights are established by

statute does not mean, however, that they are required in every instance as a matter of constitutional due process of law. *Id.* at 204.

We assume for purposes of discussion only that Harris County possessed an interest in the litigation sufficient to invoke the constitutional guarantees of due process of law.

■ We believe, nevertheless, that Harris County has not shown a violation of its procedural rights, whether under the APA or the federal and state constitutions. There is no claim that the Commissioner acquired facts, through his consultations, that were simultaneously (1) outside the evidentiary record and (2) grounds for the decision made by the three Commissioners. *See Galveston County v. Texas Dep't of Health*, 724 S.W.2d 115, 124 (Tex.App.—Austin 1987, writ ref'd n.r.e.). Harris County's position is that the mere fact that the consultations *occurred* is sufficient to establish a violation of the constitutional guarantees of procedural due process of law. We reject this theory. *See Withrow v. Larkin*, 421 U.S. 35, 55, 95 S.Ct. 1456, 1468, 43 L.Ed.2d 712 (1975) (noting that State administrators are presumed to be free of bias and "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient to impugn" their fairness at an adversary hearing). Nor can we find that section 2001.061 of the APA is unconstitutional in purporting to authorize agency heads to consult with their staff for the purposes indicated in the statute. *Larkin*, 421 U.S. at 58, 95 S.Ct. at 1470 ("The combination of investigative and adjudicative functions does not, without more, constitute a due process violation.").

We overrule the point of error.

## CONCLUSION

Smith and Jackson "individually and collectively," urge on appeal 458 points of error as reasons for reversing the Commissions' final order. These are set out in an appendix to a brief of forty-nine pages of reduced type. Fortunately, most of the 458 points of error are grouped for discussion in the brief, and we have followed suit in our opinion. To the extent we have not made express reference to the 458 points of error, we hereby overrule

them based on our discussions under the groups in which they were included in the brief. We have referred to these groups by the designations employed in the brief, such as point of error "I.A.3."

Finding no error in the trial-court judgment or in the Commission's final order, we affirm the district-court judgment.